AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )    Case No. **1:20-MJ-00559**
Dell laptop (SUBJECT DEVICE A) )
Cosmos custom built computer tower (SUBJECT DEVICE B) )
10 External hard drives (SUBJECT DEVICES C) )

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
SEE ATTACHMENT A

located in the _____SOUTHERN_____ District of _____OHIO_____ , there is now concealed *(identify the person or describe the property to be seized)*:
SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
| --- | --- |
| 18 U.S.C. 2252(a)(4)(B), 2252A(a)(5)(B), 2252(a)(2)(B) , and 2252A(a)(2) | Possession of Child Pornography; Distribution and Receipt of Child Pornography, |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT
☑ Continued on the attached sheet.
☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Christopher Wallace, Special Agent HSI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____FaceTime Video_____ *(specify reliable electronic means)*.

Date: **Jul 22, 2020**

_____
*Judge's signature*

City and state: Cincinnati, Ohio

Stephanie K. Bowman US Magistrate
*Printed name and title*

## ATTACHMENT A

The property to be searched is:

1.  Dell laptop (SUBJECT DEVICE A);

2.  Cosmos custom built computer tower (SUBJECT DEVICE B);

3.  10 External hard drives (SUBJECT DEVICES C);

The SUBJECT DEVICES are currently stored in a secure locker in the HOMELAND SECURITY INVESTIGATIONS OFFICE LOCATED AT 9875 REDHILL DRIVE, BLUE ASH, OHIO 45242

This warrant authorizes the forensic examination of SUBJECT DEVICES for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

### ITEMS TO BE SEIZED

The following materials, which constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, or property designed or intended for use or which is or has been used as the means of committing a criminal offense, namely violations of 18 U.S.C. § § 2252 and 2252A:

1. Computers or storage media used as a means to commit the violations described above.

2. For any computer or storage medium whose search of seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which are stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

   a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved user names and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

   b. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

   c. evidence of the lack of such malicious software;

d.  evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to the crime(s) under investigation and to the computer user;

e.  evidence indicating the computer user's knowledge and/or intent as it relates to the crime(s) under investigation;

f.  evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g.  evidence of programs (and associated data) that are designed to eliminate data from the COMPUTER;

h.  evidence of the times the COMPUTER was used;

i.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k.  records of or information about Internet Protocol addresses used by the COMPUTER;

l.  records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

m.  contextual information necessary to understand the evidence described in this attachment.

3. Routers, modems, and network equipment used to connect computers to the Internet.

4. Child pornography, as defined in 18 U.S.C. § 2256(8), visual depictions of minors engaging in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2), and child erotica.

5. Any records or information relating to the presence or use of Tor.

6. Records, information, and items relating to violations of the statutes described above including:

   a. Records, information, and items relating to the occupancy or ownership of the 3675 Saybrook Avenue, Cincinnati, Ohio including utility and telephone bills, mail envelopes, or addressed correspondence;

   b. Records, information, and items relating to the ownership or use of computer equipment obtained from the residence, including sales receipts or bills for Internet access.

   c. Records and information relating to the identity or location of the persons suspected of violating the statutes described above;

   d. Records and information relating to sexual exploitation of children, including correspondence and communications between users of child pornography and exploitation websites.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing

or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded, including external and internal hard drives, flash drives, thumb drives, micro SD cards, macro SD cards, DVDs, gaming systems, SIM cards, cellular phones capable of storage, floppy disks, compact discs, magnetic tapes, memory cards, memory chips, and other magnetic or optical media.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, HSI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Christopher Wallace, a Special Agent with Homeland Security Investigations, being duly sworn, depose and state as follows:

### INTRODUCTION

1.      I am a Special Agent with Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), and I have been so employed since May of 2005. As part of my daily duties as an HSI agent, I investigate criminal violations relating to child exploitation and child pornography, including violations pertaining to the production, distribution, receipt and possession of child pornography, in violation of 18 U.S.C. §§ 2251, 2252(a) and 2252A. I have received training in the area of child pornography and child exploitation.  I have additionally had the opportunity to observe and review numerous examples of child pornography (as defined in 18 U.S.C. § 2256) in all forms of media including computer media. I have also participated in the execution of numerous search warrants, a number of which involved child exploitation and/or child pornography offenses.

2.      This affidavit is being made in support of an application for a search warrant for the following electronic devices which were seized on July 15, 2020, from a residence located at 3675 Saybrook Avenue, Cincinnati, Ohio by law enforcement authorities:

a.      Dell laptop (SUBJECT DEVICE A);

b.      Cosmos custom built computer tower (SUBJECT DEVICE B);

c.      10 External hard drives (SUBJECT DEVICES C);

1

The above electronic devices are currently located at the Department of Homeland Security, 9875 Redhill Drive, Blue Ash, Ohio, 45242, and as more fully described in Attachment A.

3.      The purpose of this search warrant request is to search and seize evidence stored on electronic media, more particularly described in Attachment B, which is considered to be violations of 18 U.S.C. §§ 2252(a)(4)(B) and 2252A(a)(5)(B), which make it a crime to possess child pornography and access child pornography with intent to view it, and violations of 18 U.S.C. §§ 2252(a)(2)(B) and 2252A(a)(2), which make it a crime to receive and distribute child pornography.   The items to be searched for and seized are described more particularly in Attachment B hereto.

4.      The statements contained in this Affidavit are based in part on my personal investigation of this matter and on information provided to me by other law enforcement agents. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.  I have elected to set forth only those facts that I believe are necessary to establish probable cause to search for evidence of violations of 18 U.S.C. §§ 2252 and 2252A which is believed to be present within stored data located on the SUBJECT DEVICES.

5.      As a result of the instant investigation described more fully below, there is probable cause to believe that evidence, fruits, and instrumentalities of violations of federal law, including 18 U.S.C. §§ 2252 and 2252A, are present within the stored data located on the SUBJECT DEVICES.

**STATUTORY AUTHORITY**

6.      As noted above, this investigation concerns alleged violations of the following:

a.      18 U.S.C. § 2252(a)(1) and (b)(1) prohibit any person from knowingly transporting or shipping, or attempting or conspiring to transport or ship, any visual depiction using any means or facility of interstate or foreign commerce, or in or affecting interstate or foreign commerce, by any means, including by computer or mail, if the production of such visual depiction involved the use of a minor engaging in sexually explicit conduct and such visual depiction is of such conduct.

b.      18 U.S.C. § 2252(a)(2) and (b)(1) prohibit any person from knowingly receiving or distributing, or attempting or conspiring to receive or distribute, any visual depiction using any means or facility of interstate or foreign commerce, or that has been mailed or shipped or transported in or affecting interstate or foreign commerce, or which contains materials which have been mailed or so shipped or transported, by any means including by computer, or knowingly reproducing any visual depiction for distribution using any means or facility of interstate or foreign commerce, or in or affecting interstate or foreign commerce or through the mails, if the production of such visual depiction involved the use of a minor engaging in sexually explicit conduct and such visual depiction is of such conduct.

c.      18 U.S.C. § 2252(a)(4)(B) and (b)(2) prohibit any person from knowingly possessing or accessing with the intent to view, or attempting or conspiring to possess or access with the intent to view, 1 or more books, magazines, periodicals, films, video tapes, or other matter which contain any visual depiction that has been mailed, or has been shipped or transported using any means or facility of interstate or foreign commerce

3

or in or affecting interstate or foreign commerce, or which was produced using materials which have been mailed or so shipped or transported, by any means including by computer, if the production of such visual depiction involved the use of a minor engaging in sexually explicit conduct and such visual depiction is of such conduct.

        d.      18 U.S.C. § 2252A(a)(1) and (b)(1) prohibit a person from knowingly mailing, or transporting or shipping using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer, any child pornography, as defined in 18 U.S.C. § 2256(8), or attempting or conspiring to do so.

        e.      18 U.S.C. § 2252A(a)(2)(A) and (b)(1) prohibit a person from knowingly receiving or distributing, or attempting or conspiring to receive or distribute, any child pornography or any material that contains child pornography, as defined in 18 U.S.C. § 2256(8), that has been mailed, or using any means or facility of interstate or foreign commerce shipped or transported in or affecting interstate or foreign commerce by any means, including by computer.

        f.      18 U.S.C. § 2252A(a)(5)(B) and (b)(2) prohibit a person from knowingly possessing or knowingly accessing with intent to view, or attempting or conspiring to do so, any material that contains an image of child pornography, as defined in 18 U.S.C. § 2256(8), that has been mailed, or shipped or transported using any means or facility of interstate or foreign commerce, or in or affecting interstate or foreign commerce, by any means, including by computer, or that was produced using materials that have been

mailed or shipped or transported in or affecting interstate or foreign commerce by any means, including by computer.

## **DEFINITIONS**

7.      The following definitions apply to this Affidavit and Attachment B:

a.      "Bulletin Board" means an Internet-based website that is either secured (accessible with a password) or unsecured, and provides members with the ability to view postings by other members and make postings themselves.  Postings can contain text messages, still images, video images, or web addresses that direct other members to specific content the poster wishes.  Bulletin boards are also referred to as "internet forums" or "message boards."  A "post" or "posting" is a single message posted by a user.  Users of a bulletin board may post messages in reply to a post.  A message "thread," often labeled a "topic," refers to a linked series of posts and reply messages.  Message threads or topics often contain a title, which is generally selected by the user who posted the first message of the thread.  Bulletin boards often also provide the ability for members to communicate on a one-to-one basis through "private messages."  Private messages are similar to e-mail messages that are sent between two members of a bulletin board.  They are accessible only by the users who sent/received such a message, or by the bulletin board administrator.

b.      "Chat," as used herein, refers to any kind of text communication over the Internet that is transmitted in real-time from sender to receiver.  Chat messages are generally short in order to enable other participants to respond quickly and in a format that resembles an oral conversation.  This feature distinguishes chatting from other text-based online communications such as Internet forums and email.

5

c.      "Chat room," as used herein, refers to the ability of individuals to meet in one location on the Internet in order to communicate electronically in real-time to other individuals. Individuals may also have the ability to transmit electronic files to other individuals within the chat room.

d.      "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not necessarily obscene or do not necessarily depict minors engaging in sexually explicit conduct.

e.      "Child pornography," as defined in 18 U.S.C. § 2256(8), is any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical or other means, of sexually explicit conduct, where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

f.      "Cloud storage," as used herein, is a form of digital data storage in which the digital data is stored on remote servers hosted by a third party (as opposed to, for example, on a user's computer or other local storage device) and is made available to users over a network, typically the Internet.

g.      "Computer," as used herein, refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or

6

operating in conjunction with such device" and includes smartphones, other mobile phones, and other mobile devices. *See* 18 U.S.C. § 1030(e)(1).

   h. "Computer hardware," as used herein, consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, "thumb," "jump," or "flash" drives, which are small devices that are plugged into a port on the computer, and other memory storage devices); peripheral input/output devices (including keyboards, printers, video display monitors, and related communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including physical keys and locks).

   i. "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates what might be termed a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

7

j.      The "Domain Name System" or "DNS" is system that translates readable Internet domain names such as www.justice.gov into the numerical IP addresses of the computer server that hosts the website.

k.      "Encryption" is the process of converting data into a code in order to prevent unauthorized access to the data.

l.      A "hidden service," also known as an "onion service," is website or other web service that is accessible only to users operating within the Tor anonymity network.

m.      "Hyperlink" refers to an item on a web page which, when selected, transfers the user directly to another location in a hypertext document or to some other web page.

n.      The "Internet" is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

o.      "Internet Service Providers" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, email, remote storage, and co-location of computers and other communications equipment.

p.      An "Internet Protocol address" or "IP address," as used herein, refers to a unique numeric or alphanumeric string used by a computer or other digital device to access the Internet. Every computer or device accessing the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer or device may be directed properly from its source

8

to its destination. Most Internet Service Providers ("ISPs") control a range of IP addresses. IP addresses can be "dynamic," meaning that the ISP assigns a different unique number to a computer or device every time it accesses the Internet. IP addresses might also be "static," if an ISP assigns a user's computer a particular IP address that is used each time the computer accesses the Internet. ISPs typically maintain logs of the subscribers to whom IP addresses are assigned on particular dates and times.

      q.    "Minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years.

      r.    "Records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form.

      s.    "Remote computing service," as defined in 18 U.S.C. § 2711(2), is the provision to the public of computer storage or processing services by means of an electronic communications system.

      t.    "Sexually explicit conduct," as defined in 18 U.S.C. § 2256(2), means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the anus, genitals, or pubic area of any person.

      u.    A "storage medium" is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, "thumb," "jump," or "flash" drives, CD-ROMs, and other magnetic or optical media.

v.   The "Tor network" is a computer network available to Internet users that is designed specifically to facilitate anonymous communication over the Internet. The Tor network attempts to do this by routing Tor user communications through a globally distributed network of relay computers, along a randomly assigned path known as a "circuit."

w.   "URL" is an abbreviation for Uniform Resource Locator and is another name for a web address. URLs are made of letters, numbers, and other symbols in a standard form. People use them on computers by clicking a pre-prepared link or typing or copying and pasting one into a web browser to make the computer fetch and show some specific resource (usually a web page) from another computer (web server) on the Internet.

x.   "Visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disc or other electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

y.   A "Website" consists of textual pages of information and associated graphic images. The textual information is stored in a specific format known as Hyper-Text Mark-up Language (HTML) and is transmitted from web servers to various web clients via Hyper-Text Transport Protocol (HTTP).

## BACKGROUND OF THE INVESTIGATION AND PROBABLE CAUSE

8.   A user of the Internet account at the 3675 Saybrook Avenue has been linked to an online community of individuals who regularly send and receive child pornography via a hidden service website that operated on the Tor anonymity network. The website is described below

10

and referred to herein as the "TARGET WEBSITE."[1]  There is probable cause to believe that a user of the Internet account at the 3675 Saybrook Avenue accessed the TARGET WEBSITE, as further described herein.

### The Tor Network

9.    The Internet is a global network of computers and other devices.  Devices directly connected to the Internet are uniquely identified by IP addresses, which are used to route information between Internet-connected devices.  Generally, when one device requests information from a second device, the requesting device specifies its own IP address so that the responding device knows where to send its response.  On the Internet, data transferred between devices is split into discrete packets, each of which has two parts: a header with non-content routing and control information, such as the packet's source and destination IP addresses; and a payload, which generally contains user data or the content of a communication.

10.    The website further described below operated on the Tor network, which is a computer network available to Internet users that is designed specifically to facilitate anonymous communication over the Internet.  The Tor network attempts to do this by routing Tor user communications through a globally distributed network of relay computers, along a randomly assigned path known as a "circuit." Because of the way the Tor network routes communications through the relay computers, traditional IP address-based identification techniques are not effective.

---

[1] The name of the TARGET WEBSITE is known to law enforcement.  Investigation into the users of the website remains ongoing and disclosure of the name of the website would potentially alert active website users to the investigation, potentially provoking users to notify other users of law enforcement action, flee, and/or destroy evidence.

11.     To access the Tor network, a user must install Tor software.  That is most easily done by downloading the free "Tor browser" from the Tor Project, the private entity that maintains the Tor network, via their website at www.torproject.org.[2]  The Tor browser is a web browser that is configured to route a user's Internet traffic through the Tor network.

12.     As with other Internet communications, a Tor user's communications are split into packets containing header information and a payload, and are routed using IP addresses.  In order for a Tor user's communications to be routed through the Tor network, a Tor user necessarily (and voluntarily) shares the user's IP address with Tor network relay computers, which are called "nodes."  This routing information is stored in the header portion of the packet.  As the packets travel through the Tor network, each node is able to see the address information of the previous node the communication came from and the next node the information should be sent to.  Those Tor nodes are operated by volunteers – individuals or entities who have donated computers or computing power to the Tor network in order for it to operate.

13.     Tor may be used to access open-Internet websites like www.justice.gov.  Because a Tor user's communications are routed through multiple nodes before reaching their destination, when a Tor user accesses such an Internet website, only the IP address of the last relay computer (the "exit node"), as opposed to the Tor user's actual IP address, appears on that website's IP address log.  In addition, the content of a Tor user's communications are encrypted while the communication passes through the Tor network.  That can prevent the operator of a Tor node from observing the content (but not the routing information) of other Tor users' communications.

---

[2] Tor users may also choose to manually configure a web browser or other application to route communications through the Tor network.

14.     The Tor Project maintains a publicly available frequently asked questions (FAQ) page, accessible from its website, with information about the Tor network. Within those FAQ, the Tor Project advises Tor users that the first Tor relay to which a user connects can see the Tor user's actual IP address. In addition, the FAQ also cautions Tor users that the use of the Tor network does not render a user's communications totally anonymous. For example, in the Tor Project's FAQ, the question "So I'm totally anonymous if I use Tor?" is asked, to which the response is, in bold text, "No."

15.     The Tor Network also makes it possible for users to operate or access websites that are accessible only to users operating within the Tor network. Such websites are called "hidden services" or "onion services." They operate in a manner that attempts to conceal the true IP address of the computer hosting the website. Like other websites, hidden services are hosted on computer servers that communicate through IP addresses. However, hidden services have unique technical features that attempt to conceal the computer server's location.

16.     Unlike standard Internet websites, a Tor-based web address is comprised of a series of either 16 or 56 algorithm-generated characters, for example "asdlk8fs9dflku7f," followed by the suffix ".onion." Ordinarily, investigators can determine the IP address of the computer server hosting a website (such as www.justice.gov) by simply looking it up on a publicly available Domain Name System ("DNS") listing. Unlike ordinary Internet websites, however, there is no publicly available DNS listing through which one can query the IP address of a computer server that hosts a Tor hidden service. So, while law enforcement agents can often view and access hidden services that are facilitating illegal activity, they cannot determine the IP address of a Tor hidden service computer server via public lookups. Additionally, as with all Tor

13

communications, communications between users' computers and a Tor hidden service webserver are routed through a series of intermediary computers. Accordingly, neither law enforcement nor hidden-service users can use public lookups or ordinary investigative means to determine the true IP address – and therefore the location – of a computer server that hosts a hidden service.

## Description of TARGET WEBSITE

17.     The TARGET WEBSITE is an active online chat site whose primary purpose is to share and distribute child pornography. The advertisement and distribution of child pornography and child erotica are regular occurrences on this site. On the front page of the site, it states that the site is intended for users to "post links with good photos and videos" depicting "[o]nly GIRLS 5 to 13 years [old]."

18.     The TARGET WEBSITE started operating in approximately 2018 and allows users to engage in online chat with other users, either within chat rooms that are openly accessible to any user of the site, within rooms only accessible to particular users, or in one-to-one chats between two users. Child pornography images and videos are trafficked through this chat site via the postings of web links within chat messages. The links allow a user to navigate to another website, such as a file-hosting website, where images and/or videos are stored, in order to download these image and videos. Entry to the site is obtained through free registration.

19.     Law Enforcement Agents, acting in an undercover capacity have observed approximately one million messages being exchanged on the TARGET WEBSITE since 2018. Law Enforcement Agents, acting in an undercover capacity has also observed approximately one million five hundred thousand files of child pornography being shared between users of the TARGET WEBSITE since 2018.

14

**Evidence Related to Identification of Target that Accessed TARGET WEBSITE**

20.     I am aware that U.S. as well as foreign law enforcement agencies investigate anonymous offenders engaging in online child sexual exploitation via Tor hidden service websites such as the website(s) described herein.  Those websites are globally accessible. The websites and their users may therefore be located anywhere in the world.  Due to the anonymity provided by the Tor network, it can be difficult or impossible to determine, at the beginning of an investigation, where in the world a particular website or user is located.  Accordingly, when a law enforcement agency obtains evidence that such a website or website user may be located in another country, it is common practice for that law enforcement agency to share information with a law enforcement agency in the country where the website is located or the offender appears to reside, in accordance with each country's laws.

21.     In August 2019, a foreign law enforcement agency (referenced herein as "FLA") known to the FBI and HSI with a history of providing reliable, accurate information in the past, notified the FBI and HSI that FLA determined that on April 14, 2019, IP address 174.101.158.247 "was used to access online child sexual abuse and exploitation material" via a website that the FLA named and described as the TARGET WEBSITE.

22.     FLA is a national law enforcement agency of a country with an established rule of law.  There is a long history of U.S. law enforcement sharing criminal investigative information with FLA and FLA sharing criminal investigative information with U.S. law enforcement, across disciplines and including the investigation of crimes against children.  FLA advised U.S. law enforcement that it obtained that information through independent investigation that was lawfully authorized in FLA's country pursuant to its national laws.  FLA further advised U.S.

15

law enforcement that FLA had not interfered with, accessed, searched or seized any data from any computer in the United States in order to obtain that IP address information. U.S. law enforcement personnel did not participate in the investigative work through which FLA identified the IP address information provided by FLA.

23. I am aware through my training and experience and consultation with other U.S. law enforcement agents that tips provided by FLA regarding IP addresses that FLA advised were associated with access to Tor network child exploitation-related web and chat sites have: (1) led to the identification and arrest of a U.S.-based child pornography producer and hands-on offender, and the identification and rescue of multiple U.S. children subject to that offender's ongoing abuse; (2) led to the seizure of evidence of child pornography trafficking and possession; and (3) been determined through further investigation to be related to targets that U.S. law enforcement investigation had independently determined were associated with child pornography trafficking and possession.

24. As described herein, the TARGET WEBSITE could not generally be accessed through the traditional internet. Only a user who had installed the appropriate Tor software on the user's computer could access the "TARGET WEBSITE." Even after connecting to the Tor network, however, a user would have to find the 16-or-56-character web address of the TARGET WEBSITE in order to access it. Hidden service websites on the Tor Network are not "indexed" by search engines—such as Google—to anywhere near the same degree as websites that operate on the open Internet. Accordingly, it is much more difficult to perform a Google-type search of hidden service websites than it is to search open Internet websites for particular content of interest. Users interested in accessing child exploitation material (or in advertising child

16

exploitation and pornography websites they operate) therefore keep, maintain and use directory sites that advertise the web addresses of hidden services that contain child exploitation related content. Those directory sites also operate via the Tor network. Users utilize those directory sites to identify new web forums, chat sites, image galleries and file hosts pertaining to the sexual exploitation of children. Such directory sites often identify whether particular sites are then operating, whether child pornography imagery may be found there, and even what types of child pornography are accessible (i.e., boys, girls, or "hurtcore"). They also contain clickable hyperlinks to access those sites. As with other hidden service websites, a user must find the 16- or-56 character web address for a directory website in order to access it. While it operated, the web address for the website described herein was listed on one or more of such directory sites advertising hidden services dedicated to the sexual exploitation of children.

25.     Accordingly, based on my training and experience and the information articulated herein, because accessing the TARGET WEBSITE required numerous affirmative steps by the user – to include downloading Tor software, accessing the Tor network, finding the web address for TARGET WEBSITE, and then connecting to TARGET WEBSITE via Tor – it is extremely unlikely that any user could simply stumble upon TARGET WEBSITE without understanding its purpose and content.

26.     Accordingly, I submit that there is probable cause to believe that, for all of the reasons described herein, any user who accessed the TARGET WEBSITE has, at a minimum, knowingly accessed the TARGET WEBSITE with intent to view child pornography, or attempted to do so.

### Identification of 3675 Saybrook Avenue

17

27.    According to publicly available information, IP address 174.101.158.247, which was used to access TARGET WEBSITE on April 14, 2019, is registered to Charter Spectrum.

28.    On November 20, 2019, a DHS summons was issued to Charter Spectrum in regard to the pertinent IP address. A review of the results identified the account holder as William Mellman and the address as 3675 Saybrook Avenue in Cincinnati, Ohio.

29.    On July 14, 2020, HSI Special Agents Christopher Wallace and Kim Wallace conducted a consensual interview with William Mellman and Elizabeth Johnson at 3675 Saybrook Avenue. The interview occurred outside, on the back porch of the residence. Special Agent Christopher Wallace informed Mellman and Johnson that a website used in the exchange of child pornography had been accessed from 3675 Saybrook Avenue and requested consent to forensically examine any computers owned by Mellman and Johnson. Mellman and Johnson requested time to "think it over," and stated that either Mellman or Johnson would call Special Agent Christopher Wallace the following day with a decision.

30.    On July 15, 2020, William Mellman called Special Agent Christopher Wallace and stated that Mellman and Elizabeth Johnson would consent to a forensic examination of the computers located at 3675 Saybrook Avenue. Special Agents Christopher Wallace and Cameron Bryant arrived at the residence later that same day. Special Agent Christopher Wallace provided Mellman and Johnson with an HSI computer forensics consent form. Mellman and Johnson each read and signed the form.

31.    Special Agent Cameron Bryant began an onsite forensic examination of a Dell laptop (Subject Device A) belonging to William Mellman. During the examination Special Agent Bryant located hundreds of images of child pornography. The images were located in a

18

temporary internet folder which is a folder used by the operating system generally to store webpage content on the computer hard drive for quicker viewing of webpages. Special Agent Christopher Wallace informed Mellman of the discovery of child pornography and asked Mellman to confirm that the Dell laptop was owned and used by Mellman. Mellman confirmed that he (William Mellman) owned and regularly used the Dell laptop, but had no knowledge of child pornography being on the machine.

32.     Special Agent Christopher Wallace observed the child pornography on the Dell laptop belonging to Mellman and noted the following:

      a.     Numerous files with labels such as 3 yo -5 yo too extreme.png and young CP videos.png

      b.     An image file that depicted a close up view of a toddlers vagina. An adult hand could also be seen spreading open the toddler's vagina

      c.     An image file that depicted a series of images of child pornography displayed in a grid. One of the images in the grid depicted a naked prepubescent female laying on a bed. An adult penis can be seen resting on the prepubescent female's feet just below the prepubescent female's vagina. Two (2) additional images in the grid depict prepubescent female's engaged in oral sex with an adult male.

33.     Special Agent Christopher Wallace asked Mellman for permission to take the Dell laptop (Subject Device A) and also a Cosmos custom built PC tower (Subject Device B) and ten (10) external hard drives (Subject Devices C) belonging to Mellman to the HSI office for a more in depth forensic examination. Mellman agreed and was given a receipt for the property.

**BACKGROUND ON CHILD PORNOGRAPHY, COMPUTERS, AND THE INTERNET**

34.     I have had both training and experience in the investigation of computer-related crimes.  Based on my training, experience, and knowledge, I know the following:

a.      Computers and digital technology are the primary way in which individuals interested in child pornography interact with each other.  Computers basically serve four functions in connection with child pornography:  production, communication, distribution, and storage.

b.      Digital cameras and smartphones with cameras save photographs or videos as a digital file that can be directly transferred to a computer by connecting the camera or smartphone to the computer, using a cable or via wireless connections such as "WiFi" or "Bluetooth."  Photos and videos taken on a digital camera or smartphone may be stored on a removable memory card in the camera or smartphone.  These memory cards are often large enough to store thousands of high-resolution photographs or videos.

c.      A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection.  Mobile devices such as smartphones and tablet computers may also connect to other computers via wireless connections.  Electronic contact can be made to literally millions of computers around the world.  Child pornography can therefore be easily, inexpensively and anonymously (through electronic communications) produced, distributed, and received by anyone with access to a computer or smartphone.

d.      The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography.  Electronic storage media of various

20

types - to include computer hard drives, external hard drives, CDs, DVDs, and "thumb," "jump," or "flash" drives, which are very small devices that are plugged into a port on the computer - can store thousands of images or videos at very high resolution. It is extremely easy for an individual to take a photo or a video with a digital camera or camera-bearing smartphone, upload that photo or video to a computer, and then copy it (or any other files on the computer) to any one of those media storage devices. Some media storage devices can easily be concealed and carried on an individual's person. Smartphones and/or mobile phones are also often carried on an individual's person.

      e.      The Internet affords individuals several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion.

      f.      Individuals also use online resources to retrieve and store child pornography. Some online services allow a user to set up an account with a remote computing service that may provide email services and/or electronic storage of computer files in any variety of formats. A user can set up an online storage account (sometimes referred to as "cloud" storage) from any computer or smartphone with access to the Internet. Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer, smartphone, or external media in most cases.

      g.      A growing phenomenon related to smartphones and other mobile computing devices is the use of mobile applications, also referred to as "apps." Apps consist of software downloaded onto mobile devices that enable users to perform a variety of tasks – such as engaging in online chat, sharing digital files, reading a book, or

21

playing a game -- on a mobile device. Individuals commonly use such apps to receive, store, distribute, and advertise child pornography, to interact directly with other like-minded offenders or with potential minor victims, and to access cloud-storage services where child pornography may be stored.

   h.  As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes. Storing this information can be intentional (*i.e.*, by saving an email as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files) or unintentional. Digital information, such as the traces of the path of an electronic communication, may also be automatically stored in many places (*e.g.*, temporary files or ISP client software, among others). In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. Such information is often maintained indefinitely until overwritten by other data.

## CHARACTERISTICS COMMON TO INDIVIDUALS WHO POSSESS CHILD PORNOGRAPHY

35.  Based on my previous investigative experience related to child exploitation investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I know there are certain characteristics common to individuals who possess child pornography:

   a.  Such individuals may receive sexual gratification, stimulation, and satisfaction from contact with children, or from fantasies they may have viewing children

engaged in sexual activity or in sexually suggestive poses, such as in person, in

photographs, or other visual media, or from literature describing such activity.

b.      Such individuals may collect sexually explicit or suggestive materials in a

variety of media, including photographs, magazines, motion pictures, videotapes, books,

slides and/or drawings or other visual media.  Individuals who have a sexual interest in

children or images of children oftentimes use these materials for their own sexual arousal

and gratification.  Further, they may use these materials to lower the inhibitions of

children they are attempting to seduce, to arouse the selected child partner, or to

demonstrate the desired sexual acts.

c.      Such individuals almost always possess and maintain child pornographic

material in the privacy and security of their home or some other secure location.

Individuals who have a sexual interest in children or images of children typically retain

those materials and child erotica for many years.

d.      Likewise, such individuals often maintain their child pornography images

in a digital or electronic format in a safe, secure and private environment, such as a

computer and surrounding area.  These child pornography images are often maintained

for several years and are kept close by, usually at the possessor's residence, inside the

possessor's vehicle, or, at times, on their person, or in cloud-based online storage, to

enable the individual to view the child pornography images, which are valued highly.

Some of these individuals also have been found to download, view, and then delete child

pornography on their computers or digital devices on a cyclical and repetitive basis.

e.      Importantly, evidence of such activity, including deleted child

23

pornography, often can be located on these individuals' computers and digital devices through the use of forensic tools. Indeed, the very nature of electronic storage means that evidence of the crime is often still discoverable for extended periods of time even after the individual "deleted" it.[3]

      f.      Such individuals also may correspond with and/or meet others to share information and materials, rarely destroy correspondence from other child pornography distributors/possessors, conceal such correspondence as they do their sexually explicit material, and often maintain contact information (e.g. online messaging accounts, email addresses, etc.) of individuals with whom they have been in contact and who share the same interests in child pornography.

      g.      Such individuals prefer not to be without their child pornography for any prolonged time period. This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

      h.      Even if the target uses a portable device (such as a mobile phone) to access the Internet and child pornography, it is more likely than not that evidence of this access will be found in his home, the 3675 Saybrook Avenue, as set forth in Attachment A, including on digital devices other than the portable device (for reasons including the

---

[3] *See United States v. Carroll*, 750 F.3d 700, 706 (7th Cir. 2014) (concluding that 5-year delay was not too long because "staleness inquiry must be grounded in an understanding of both the behavior of child pornography collectors and of modern technology"); *see also United States v. Seiver*, 692 F.3d 774 (7th Cir. 2012) (Posner, J.) (collecting cases, e.g., *United States v. Allen*, 625 F.3d 830, 843 (5th Cir. 2010); *United States v. Richardson*, 607 F.3d 357, 370-71 (4th Cir. 2010); *United States v. Lewis*, 605 F.3d 395, 402 (6th Cir. 2010)).

frequency of "backing up" or "synching" mobile phones to computers or other digital devices).

36.     Based on all of the information contained herein, I believe that an internet user residing at the 3675 Saybrook Avenue likely displays characteristics common to individuals who possess child pornography.  In particular, the target of investigation obtained and used Tor network software, found the web address for TARGET WEBSITE, and accessed online child sexual abuse and exploitation material via the TARGET WEBSITE.  Further, a review of one computer from the residence located child pornography.

## SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEMS

37.     As described above and in Attachment B, this application seeks permission to search the devices obtained from 3675 Saybrook Avenue for evidence in whatever form they are found.  One form in which the records are likely to be found is data stored on a computer's hard drive or other storage media.  Thus, the warrant applied for would authorize the search of the electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

38.     I submit that for the computers and storage medium obtained from 3675 Saybrook Avenue, there is probable cause to believe those records referenced above will be stored on that computer or storage medium, for at least the following reasons:

    a.     Deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a

25

computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

      b.    Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

      c.    Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

      d.    Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

      e.    As previously detailed, child pornography was discovered on the Dell laptop (Subject Device A).

26

39.     As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when.  There is probable cause to believe that this forensic electronic evidence will be on the computer and storage medium obtained from 3675 Saybrook Avenue because:

a.     Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, email programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use.  Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.     Information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (*e.g.,*

27

registry information, communications, images and movies, transactional information, records of session times and durations, Internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, computers typically contain information that logs: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the Internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (*e.g.*, a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein

28

may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (*e.g.*, Internet searches indicating criminal planning), or consciousness of guilt (*e.g.*, running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

      c.     A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

      d.     The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

      e.     Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of

29

counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

   f.  I know that when an individual uses a computer to obtain or access child pornography, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

  40.  Based upon my training and experience and information relayed to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices, including external and internal hard drives, flash drives, thumb drives, micro SD cards, macro SD cards, DVDs, gaming systems, SIM cards, cellular phones capable of storage, floppy disks, compact disks, magnetic tapes, memory cards, memory chips, and online or offsite storage servers maintained by corporations, including but not limited to "cloud" storage. I also know that it is not always possible to thoroughly search computer equipment and storage devices at a suspects premises for data for a number of reasons, including the following:

a.     Searching computer systems is a highly technical process that requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search website all of the technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software, or operating system that is being searched;

b.     Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted, or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted;

c.     The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises; and

d.     Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often

31

are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is contraband, evidence, fruits, or instrumentalities of a crime.

41.     Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## **CONCLUSION**

42.     Based on the foregoing, there is probable cause to believe that the federal criminal statutes cited herein have been violated, and that the contraband, property, evidence, fruits and instrumentalities of these offenses, more fully described in Attachment B, are located at the locations described in Attachment A. I respectfully request that this Court issue a search warrant

32

for the locations described in Attachment A, authorizing the seizure and search of the items described in Attachment B.

43.    I am aware that the recovery of data by a computer forensic analyst takes significant time; much the way recovery of narcotics must later be forensically evaluated in a lab, digital evidence will also undergo a similar process. For this reason, the "return" inventory will contain a list of only the tangible items recovered from the premises. Unless otherwise ordered by the Court, the return will not include evidence later examined by a forensic analyst.

_____
Christopher Wallace
Special Agent

Sworn and subscribed before me this ___th day of July 2020.via Facetime Video.
                                                              22nd

_____
UNITED STATES MAGISTRATE JUDGE

33

## ATTACHMENT A

The property to be searched is:

1. Dell laptop (SUBJECT DEVICE A);

2. Cosmos custom built computer tower (SUBJECT DEVICE B);

3. 10 External hard drives (SUBJECT DEVICES C);

The SUBJECT DEVICES are currently stored in a secure locker in the HOMELAND SECURITY INVESTIGATIONS OFFICE LOCATED AT 9875 REDHILL DRIVE, BLUE ASH, OHIO 45242

This warrant authorizes the forensic examination of SUBJECT DEVICES for the purpose of identifying the electronically stored information described in Attachment B.

34

## ATTACHMENT B

### ITEMS TO BE SEIZED

The following materials, which constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, or property designed or intended for use or which is or has been used as the means of committing a criminal offense, namely violations of 18 U.S.C. § § 2252 and 2252A:

1. Computers or storage media used as a means to commit the violations described above.

2. For any computer or storage medium whose search of seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which are stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

   a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved user names and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

   b. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

   c. evidence of the lack of such malicious software;

35

d.   evidence indicating how and when the computer was accessed or used to
     determine the chronological context of computer access, use, and events relating
     to the crime(s) under investigation and to the computer user;

e.   evidence indicating the computer user's knowledge and/or intent as it relates to
     the crime(s) under investigation;

f.   evidence of the attachment to the COMPUTER of other storage devices or similar
     containers for electronic evidence;

g.   evidence of programs (and associated data) that are designed to eliminate data
     from the COMPUTER;

h.   evidence of the times the COMPUTER was used;

i.   passwords, encryption keys, and other access devices that may be necessary to
     access the COMPUTER;

j.   documentation and manuals that may be necessary to access the COMPUTER or
     to conduct a forensic examination of the COMPUTER;

k.   records of or information about Internet Protocol addresses used by the
     COMPUTER;

l.   records of or information about the COMPUTER's Internet activity, including
     firewall logs, caches, browser history and cookies, "bookmarked" or "favorite"
     web pages, search terms that the user entered into any Internet search engine, and
     records of user-typed web addresses; and

m.   contextual information necessary to understand the evidence described in this
     attachment.

36

3. Routers, modems, and network equipment used to connect computers to the Internet.

4. Child pornography, as defined in 18 U.S.C. § 2256(8), visual depictions of minors engaging in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2), and child erotica.

5. Any records or information relating to the presence or use of Tor.

6. Records, information, and items relating to violations of the statutes described above including:

    a. Records, information, and items relating to the occupancy or ownership of the 3675 Saybrook Avenue, Cincinnati, Ohio including utility and telephone bills, mail envelopes, or addressed correspondence;

    b. Records, information, and items relating to the ownership or use of computer equipment obtained from the residence, including sales receipts or bills for Internet access.

    c. Records and information relating to the identity or location of the persons suspected of violating the statutes described above;

    d. Records and information relating to sexual exploitation of children, including correspondence and communications between users of child pornography and exploitation websites.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing

37

or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded, including external and internal hard drives, flash drives, thumb drives, micro SD cards, macro SD cards, DVDs, gaming systems, SIM cards, cellular phones capable of storage, floppy disks, compact discs, magnetic tapes, memory cards, memory chips, and other magnetic or optical media.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, HSI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.